UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
New Haven Division

_____
In re:                                                    :        Chapter 11
    Eternal Enterprise, Inc.                  :        Case No. 14-20292 (AMN)
                                              :
        *Debtor*                    :
_____ :
Hartford Holdings, LLC                          :
                                              :        Adv. Pro. No. 15-02034 (AMN)
        *Plaintiff*                 :
v.                                                        :
Vera Mladen and                                 :
Dusan Mladen a/k/a David Mladen         :
                                              :
        *Defendants*                :
_____ :

Memorandum of Decision and Order

       Eternal Enterprise, Inc. ("Debtor"), the chapter 11 debtor and debtor-in-possession in the underlying bankruptcy proceedings here, case number 14-20292 (AMN)("Main Case")[1], is the owner and operator of several hundred residential apartments located in multi-family buildings in Hartford, Connecticut. On July 14, 2015, plaintiff Hartford Holdings, LLC ("HHLLC" or the "Plaintiff") – a secured creditor in the Main Case – commenced this adversary proceeding objecting to the Debtor's scheduled representation that it owes an unsecured debt of $925,784.00 (the "Purported Loans") to Vera Mladen and Dusan Mladen a/k/a David Mladen (together, the "Defendants" or the "Mladens") attributable to various monies the Mladens allegedly advanced to the Debtor

_____

[1] References to the docket of the underlying chapter 11 case, case number. 14-20292 (AMN) appear in the following format: "ECF No. _____." References to the docket of this adversary proceeding, Adversary Proceeding Case Number. 15-02034 (AMN), appear in the following format: "AP-ECF No. _____."

during the period in which they were insiders with full control over the Debtor.  AP-ECF No. 1 (the "Complaint").

In addition to objecting to the Debtor's scheduling the Purported Loans as unsecured debt (the "First Count"), pursuant to Fed.R.Bankr.P. 3007(b), the Complaint further seeks to recharacterize the Purported Loans as equity contributions pursuant to 11 U.S.C. § 105(a) (the "Second Count") or, in the alternative, to equitably subordinate the Purported Loans under 11 U.S.C. § 510(c) (the "Third Count").  After considering the parties' pleadings, memoranda, the relevant documents filed on the docket in this adversary proceeding and the Debtor's main case, the arguments and testimony presented during the trial, and for the reasons that follow, the court finds that the Purported Loans should be recharacterized as an equity contribution pursuant to 11 U.S.C. §§ 105(a) and 502(a), and, therefore, sustains HHLLC's objection to the Purported Loans.[2]

## I.    The Trial

A trial on the Complaint was held on May 23, 2016, *see* AP-ECF Nos. 70 and 71, and concluded on June 8, 2016, *see* AP-ECF No. 76, after which the court took the matter under advisement.  At the request of the parties, the trial was consolidated with *Hartford Holdings, LLC v. Goran Mladen*, Adv. Pro. No. 15-02035 (AMN) due to the significant overlap in relevant facts.  A separate Order and Opinion for *Hartford Holdings, LLC v. Goran Mladen*, Adv. Pro. No. 15-02035 (AMN) shall enter simultaneously with this Order.

---

[2] As explained below, because the court finds that the Purported Loans should be recharacterized as equity contributions, the money advanced by the Mladens does not form the basis of a claim that could be subject to equitable subordination pursuant to 11 U.S.C. § 510(c).  Therefore, HHLLC's claim for equitable subordination is mooted by this Order.

Vera Mladen and Dusan Mladen both testified regarding the understanding of the facts and circumstances relevant to the Purported Loans transactions.  Goran Mladen – the defendant in Adv. Pro. No. 15-02035 (AMN) – was represented by counsel but was not present at trial and did not testify.

## II.   Jurisdiction, Venue, and Standing

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) (matters concerning the administration of the estate), (B) (allowance or disallowance of claims against the estate . . . and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 . . .), and (O) (other proceedings affecting debtor-creditor-equity security holder relationships).   This adversary proceeding arises under the chapter 11 Main Case pending in this District; therefore, venue is proper in this District pursuant to 28 U.S.C. § 1409.  The Plaintiff, HHLLC, has standing to seek the relief sought in the complaint because, as a holder of secured and unsecured claims in the Debtor's chapter 11 case, it is a party in interest within the meaning of 11 U.S.C. § 1109.  Moreover, HHLLC has proposed its own chapter 11 plan that provides for separate classification and disparate treatment of the Mladens' scheduled claim as compared to those of other general unsecured creditors.

## III.   Findings of Fact

1. On February 19, 2014 (the "Petition Date"), the Debtor filed a voluntary chapter 11 bankruptcy petition.  In accordance with 11 U.S.C. §§ 1107 and 1108, the Debtor was and currently remains authorized to continue to operate and manage its

business as a debtor and debtor-in-possession.  No trustee or examiner has been

appointed.  *See* ECF No. 1.

2.  The Debtor is a privately held Connecticut corporation, established in 1997, that

owns and operates apartment buildings in Hartford, Connecticut.

3.  The Debtor is a "family business" operated by Vera Mladen, Dusan Mladen, their

son, Goran Mladen, and other members of the Mladen family.  Vera Mladen and

Dusan Mladen are married to each other, and Goran Mladen is their adult son.

Goran Mladen established the Debtor in 1997.  *See Testimony of Vera Mladen*,

AP-ECF No. 71 at 30:10-48:37.[3]  Since its creation, ownership of the Debtor has

been transferred from Goran Mladen to Dusan Mladen, and, more recently, to Vera

Mladen.  *Id.*  According to Vera Mladen's testimony, no other person or entity has

ever had an ownership interest in the Debtor.  *Id.*  Vera Mladen currently owns

100% of the Debtor and has served as president of the Debtor since before the

Petition Date.  *Id.*

4.  In both its original Schedule F ("Creditors Holding Unsecured Nonpriority Claims")

filed on March 21, 2014 as ECF No. 53, and its amended Scheduled F filed on July

22, 2014 as ECF No. 86, the Debtor scheduled the Purported Loans as an

unsecured debt in the amount of $925,784.00 that it owed to Vera Mladen and

---

[3] The court reviewed the audio file of the hearings using VLC Media Player.  All citations to the audio file of a hearing are to the ECF number of the recording and then to the location of the cited testimony as follows: AP-ECF No. ___ at minutes:seconds.

Dusan Mladen, together. The Purported Loans were not scheduled as disputed, contingent, or unliquidated.

5. In her capacity as president of the Debtor, and under penalty of perjury Vera Mladen electronically signed[4] a declaration verifying the truth and correctness of the Debtor's schedules, including the Debtor's original and amended Schedule F. ECF No. 53 at 31; ECF No. 86 at 5.

6. The deadline for filing proofs of claim in the Debtor's bankruptcy was June 23, 2014. The Mladens were not represented individually in the Main Case and did not file a proof of claim in any amount against the Debtor.

7. At trial, the Mladens offered three documents into evidence to substantiate their Purported Loans to the Debtor.

   a. First, Defendants' Exhibit 2 is a copy of a bank check in the amount of $785,000.00 payable to the Debtor from Eternity Fortune, Inc. signed by Vera Mladen and dated March 17, 2005. *See* Def. Ex. 2. Both the Mladens testified that Eternity Fortune, Inc. was a Massachusetts Corporation wholly owned by the Mladens through which the Mladens loaned money to the Debtor. *See Testimony of Vera Mladen*, AP-ECF No. 70 at 29:09-48:37; *Testimony of Dusan Mladen*, AP-ECF No. 76 at 11:48-14:11. Dusan Mladen testified that none of the money advanced to the Debtor through Eternity Fortune, Inc. was ever repaid. I*d.*

---

[4] Pursuant to Fed.R.Bankr.P. 5005(a)(2), Amended Standing Order No. 7 (IN RE: Electronic Case Filing and Case Management Procedures) authorizes the verification of schedules under Fed.R.Bankr.P. 1008 via electronic signature.

b.  Second, Defendants' Exhibit 2A is a copy of a bank check in the amount of $180,000.00 payable to the Debtor from Goran's Investors, Inc. signed by Goran Mladen and dated December 16, 2004.  Dusan Mladen testified that Goran's Investors, Inc. was a real estate management company based out of Holyoake, Massachusetts through which he loaned money to the Debtor. *Testimony of Dusan Mladen*, AP-ECF No. 76 at 6:00-11:45.  Dusan Mladen further testified that Goran Mladen had authority to sign checks for Goran's Investors, Inc.  *Id.* According to Dusan Mladen's testimony, he authorized his son, Goran Mladen, to write a $180,000.00 check to the Debtor from Goran Investors, Inc.'s operating account.  *Id.*  Dusan Mladen further testified that none of the $180,000.00 advanced to the Debtor was ever paid back.  *Id.*

c.  Third, Defendants' Exhibit 2B is a copy of a Sovereign Bank deposit slip for $25,000.00 dated December 2, 2005.  Dusan Mladen identified the deposit slip as a document memorializing a loan of $25,000.00 from his personal account to the Debtor.  *Testimony of Dusan Mladen*, AP-ECF No. 76 at 20:00-23:40.  Dusan Mladen further testified that none of the $25,000 was ever paid back.  *See id.*

8. Although there was no documentary evidence establishing the Mladen's ownership interest in either Eternity Fortune, Inc. or Goran's Investors, Inc., Dusan Mladen testified that the money advanced to the Debtor through these companies belonged to the Mladens and could be transferred between entities without regard to corporate formalities:

> **Court:** Your testimony on direct was that [the money in Goran's Investors, Inc.'s operating account] was "your money." I'm trying to understand what you mean by that.
>
> **A:** [W]hen I came into the company, when we purchased properties, Goran's Investors was a shell. Nothing. It had no money. So I gave the money. Who gave the 20% or 30% that we needed to purchase properties? I did. . . . So, it's my money. I owned it, so why not?

*Testimony of Dusan Mladen*, AP-ECF No. 76 at 38:34-39:24; *see also* AP-ECF No. 76 at 6:00-23:40.

9.   At trial, Vera Mladen testified that she and Dusan Mladen had made multiple loans to the Debtor during a prepetition period in which the Debtor was experiencing cash flow difficulties due to multiple vacancies. *Testimony of Vera Mladen*, AP-ECF No. 70 at 25:10.   Vera Mladen also testified that the loans had been made with the expectation of repayment "when the company was on its feet . . . when the company started to be stable . . . started to make its own money." *Id.* at 25:50-26:49.   Vera Mladen further testified that the Mladens did not memorialize the terms of the Purported Loans in a formal written agreement:

> **Q:** Aside from the check, Exhibit 2, you testified to on direct, you don't have any other written agreements that would evidence any loans in this case?
> **A:** No agreement, no.
>
> **Q:** There's no loan agreement?
> **A:** No.
>
> **Q:** There's no promissory note or mortgage? Nothing else like that other than this one check?
> **A:** Not that I know of, no.
>
> **Q:** So there's nothing in writing that we have here today that's going to tell us a specific date on which any loan had to be repaid, right?
> **A:** Like I said earlier, no.
>
> **Q:** Nothing in writing to show an interest rate?

**A:** No.

**Q:** And there was no mortgages or security agreements or other collateral pledged as security?
**A:** Not to the best of my knowledge, no.  But I was not involved in that.

**Q:** Because you treated this as a family business, correct?
**A:** Yes, it's a family business.  My kids, my husband, and me – all four of us – we were running the business.

*Testimony of Vera Mladen*, AP-ECF No. 71 at 23:31-25:03.

10. Similarly, Dusan Mladen testified that the Purported Loans were advanced without any explicit terms, without interest, and that the Mladens expected to be paid back upon the sale of the properties:

**Q:** And why did you loan money to Eternal?
**A:** Eternal is a corporation, but Eternal had properties.  Depending upon which properties we're talking about, at the time we purchased the properties they needed repairs because this is low income housing and we bought them at that time kinda cheap just because they needed many repairs, lots of renovations, and most of the money that was given was for that reason.

**Q:** When you say "many repairs," could you tell us some examples?
**A:** Yeah.  For example, we renovated bathrooms.  We renovated kitchens.  Then we needed roofs so we did the roofs, windows.

**Q:** And, all together, how much did you loan Eternal?
**A:** I think all together about a million dollars.  Maybe a bit more.  I don't know exactly but it's our business so I figure one day, when we make a sale, we get our money.

**Q:** And did you expect to get paid back?
**A:** Yes.

**Q:** And when?
**A:** Well when we make a sale, we didn't charge no interest, nothing.  I don't want no interest, but figuring out that the deposits and insurance that we were paying out, that's the amount that we would get paid back, that's the whole idea.

**Q:** And what were the terms on which the money was loaned?

**A:** No terms. I just explained that, if you were paying attention you would know what I'm saying.

**Q:** And did you have any idea how long it would take the money to be get paid back?
**A:** I thought nothing less than about 7 to 10 years because we had nothing in mind to sell the properties or getting out . . . when the market picks up, that the best time to sell. But it looks like it's delayed, I'm waiting for Trump to become president.

**Q:** Is there any documentation regarding these loans?
**A:** That is a little off on our side because we have no made no documents. I'm gonna say that if we did have documents, and we probably did, but it was not filed in place. I know every time you write a check you have to do some kind of a documentation, I cannot find no such a file, so probably it's not there. I don't know.

*Testimony of Dusan Mladen*, AP-ECF No. 71 at 46:56-50:23.

11. Dusan Mladen further testified that the Purported Loans were advanced at a time when the Debtor required significant cash infusions to cover major necessary renovations to the kitchens, bathrooms, and roofs of the Debtor's properties:

**Q:** You previously testified that it was your money you lent to Eternal, why would you lend so much money to Eternal?

**A:** At the time that Eternal was purchasing properties, it was properties that was bought with very poor maintenance. Most of the properties – because it was not one property, it was like two or three properties purchased at one time – were either half-full or half-empty, whatever you want to call it. Many many apartments was under evictions that needed to be evicted and had to be carried, maintenance, plus some mortgage payments.

So, that's how I lend because I was sure that once I lend money to these properties it will be paid one day to me without interest. I did not charge interest because I was sure that I would pull these properties together. We do a great management and are good at what we're doing. . . .

So that was basically the money that was needed. For example, we had to put on new roofs. We had to renovate further apartments. The most important thing was, for example, in 270 Laurel Street . . . the elevator was not working. That's a lot of money we had to do to operate the elevator in those days. You need this money at one time, so pay up,

pay up like a hundred-thousand dollars. It was nothing to paying with two hundred dollars, only thousands. So that was the reason I put up my own money, as a loan, hoping that one day we would get it back and I would get it back. Why, I have no reason not think, even in this situation today, why my money should not be approved.

*Testimony of Dusan Mladen*, AP-ECF No. 76 at 2:58-5:58.

## IV. Discussion

### a. Applicable Law

#### i. Burden of Proof

Federal Rule of Bankruptcy Procedure 3003 provides that claims scheduled by the Debtor are entitled to the same *prima facie* evidentiary effect as those claims for which a properly executed proof of claim is filed:

> The schedule of liabilities filed pursuant to § 521(1) of the Code shall constitute *prima facie* evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated. It shall not be necessary for a creditor or equity security holder to file a proof of claim or interest except as provided in subdivision (c)(2) of this rule.

Fed.R.Bankr.P. 3003(b)(1), *cf.* Fed.R.Bankr.P. 3001(f). Accordingly, the party objecting to the claim – here, the Plaintiff HHLLC – bears the initial burden of production to provide evidence the claim is legally insufficient. *In re Arcapita Bank B.S.C.(c)*, 508 B.R. 814, 817 (S.D.N.Y. 2014). "To overcome this *prima facie* evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *In re Reilly*, 245 B.R. 768, 773 (2nd Cir. B.A.P. 2000).

"The burden then shifts to the claimant, who must 'prove by a preponderance of the evidence that under applicable law the claim should be allowed.'" *In re Arcapita Bank B.S.C.(c)*, 508 B.R. at 817 (quoting *In re Oneida, Ltd.,* 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009)).

ii. **Bankruptcy Court's Authority to Recharacterize Claims and Interests**

Although it is not expressly provided for in the Bankruptcy Code, and the issue has not been addressed by the Second Circuit Court of Appeals, the overwhelming majority of courts to have considered the issue have concluded that bankruptcy courts, as courts of equity, are empowered to recharacterize a purported loan as an equity contribution when the true nature of the underlying transaction or transactions which form the basis for the purported claimant's rights against the bankruptcy estate is, in substance, a capital contribution. *See, In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1146 (10th Cir. 2015) ("*In re Alternate Fuels*"); *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454–56 (3rd Cir. 2006) ("*In re SubMicron*"); *In re Dornier Aviation (N. Am.), Inc.,* 453 F.3d 225, 231 (4th Cir. 2006) ("*Dornier Aviation*"); *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749 (6th Cir. 2001) ("*In re AutoStyle*"); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 566–67 (Bankr. S.D.N.Y. 2016); *In re Lyondell Chem. Co.*, 544 B.R. 75, 106 (Bankr. S.D.N.Y. 2016) ("*In re Lyondell*"); *In re BH S & B Holdings LLC*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009) ("*In re BH S & B*"); *In re Rockville Orthopedic Associates, P.C.*, 377 B.R. 438, 442 (Bankr. D. Conn. 2007); *In re Adelphia Comm'n. Corp.*, 365 B.R. 24, 73-74 (Bankr. S.D.N.Y. 2007) ("*In re Adelphia*"). "When a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion." *In re Arcapita Bank B.S.C.(c)*, 508 B.R. at 818 (quoting *Jezarian v. Raichle (In re Stirling Homex Corp.),* 579 F.2d 206, 213 (2nd Cir. 1978)).

When warranted by the facts and circumstances of the case, a bankruptcy court's exercise of its equitable powers under 11 U.S.C. § 105(a) to recharacterize purported

debt as equity is both necessary and appropriate to carry out the provisions of the Bankruptcy Code. *See, Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014). The equitable remedy of recharacterization is necessary to ensure that the substance of a party's rights is not determined by its form. *See, Pepper v. Litton,* 308 U.S. 295, 305–06 (1939) ("[Courts] have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done."). Whether a party is a creditor[5] with a claim[6] against the bankruptcy estate or an equity security[7] holder[8] with an interest in the debtor-in-possession significantly affects the rights and remedies available to such a party under the Bankruptcy Code.

For example, but without limitation, claim holders have priority over equity security holders under the Bankruptcy Code's distribution schemes for chapter 7 and chapter 11 cases. *See,* 11 U.S.C. §§ 726, 1129(a) and (b). In the context of a chapter 11 plan, the

---

[5] 11 U.S.C. § 101(10): The term "creditor" means—
(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
(B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or
(C) entity that has a community claim.

[6] 11 U.S.C. § 101(5): The term "claim" means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

[7] 11 U.S.C. § 101(16): The term "equity security" means—
(A) share in a corporation, whether or not transferable or denominated "stock", or similar security;
(B) interest of a limited partner in a limited partnership; or
(C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph.

[8] 11 U.S.C. § 101(17): The term "equity security holder" means holder of an equity security of the debtor.

characterization of the debt and equity attributable to a debtor-in-possession controls much about the reorganization process, including: (1) how a claim or interest may be classified under 11 U.S.C. § 1122; (2) whether a claim or interest is impaired within the meaning of 11 U.S.C. § 1124; (3) whether a claim or interest is allowed to vote, how such vote is counted in its class, or if the applicable class has already been "deemed" to have voted in a particular way, *see* 11 U.S.C. § 1126; (4) whether the plan's treatment of a claim or interest satisfies 11 U.S.C. § 1129(a)(7) by providing each rejecting holder of a claim or interest with "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;" and, (5) in the absence of a plan having satisfied 11 U.S.C. § 1129(a)(8), what conditions a plan proponent must meet under 11 U.S.C. § 1129(b) to establish that a proposed plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

If bankruptcy courts were bound by a party's own characterization of its rights against a debtor, "controlling equity owners of a troubled corporation could jump the line of the bankruptcy process and thwart the company's outside creditors' and investors' priority rights." *In re Hedged-Investments Associates, Inc.*, 380 F.3d 1292, 1298 (10th Cir. 2004). Moreover, recharacterization is an appropriate exercise of a bankruptcy court's 11 U.S.C. § 105(a) equitable powers because, unlike the imposition of a surcharge on a debtor's exemptions, recharacterization does not "override explicit mandates of other sections of the Bankruptcy Code." *See*, *Law v. Siegel*, 134 S. Ct. at 1194; *see also, In re Alternate Fuels,* 789 F.3d at 1149 (rejecting the argument that, after *Law v. Siegel, a*

bankruptcy court's power to recharacterize arises solely from the disallowance provision of § 502(b), rather than from § 105(a) on the grounds that disallowance and recharacterization are distinct inquiries and no explicit mandate of the Bankruptcy Code prohibits recharacterization under § 105(a)).   To the contrary, recharacterization, when warranted, is an essential remedy the bankruptcy court has the power and authority to use to preserve the distributional priorities of the Code and encourage the use of chapter 11 reorganization as a platform for reinvestment.

### iii.  Recharacterization Pursuant to the 11 *AutoStyle* Factors

Although the effect of recharacterization is similar to that of equitable subordination under 11 U.S.C. § 510(c) – namely the reprioritizing of certain parties' rights vis-à-vis the bankruptcy estate -- the analysis of the two remedies should not be conflated:

> In a recharacterization analysis, if the court determines that [an] advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the claim "as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation." In an equitable subordination analysis, the court is reviewing whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim "to that of another creditor only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective."

*In re AutoStyle*, 269 F.3d at 749. (internal citations omitted); *see also, In re BH S & B*, 420 B.R. at 157.   When, as here, a bankruptcy court determines a purported loan transaction was, in substance, actually an equity contribution, the purported loan is deemed to never have existed as a claim against the bankruptcy estate.   Since there is no claim, there is nothing to be equitably subordinated under 11 U.S.C. § 510(c), and the conduct of the former claimant is irrelevant.   *See, In re Adelphia*, 365 B.R. at 74; *see also, Matter of Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir. 1977).

In determining whether a transaction in which one party advances funds to another was intended as a loan or an equity contribution, bankruptcy courts in the Second Circuit apply eleven factors (the "*AutoStyle* Factors"): (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) identity of interest between creditor and stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advance was used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *See, In re AutoStyle*, 269 F.3d at 749-50; *see also, In re Adelphia,* 365 B.R. at 73-74; *In re Rockville Orthopedic Associates, P.C.*, 377 B.R. at 442; *In re BH S & B*, 420 B.R. at 157; *In re Lyondell*, 544 B.R. at 106; *In re Sabine Oil & Gas Corp.*, 547 B.R. at 566–67.

    **b.**    <u>Application of the Law to the Facts</u>

        **i.**    <u>The Burden of Proof as Applied in this Adversary Proceeding</u>

Here, HHLLC successfully rebutted the *prima facie* validity of the Mladen's scheduled claim against the Debtor: the Purported Loans.  *See, In re Arcapita Bank B.S.C.(c)*, 508 B.R. at 817.  The evidence at trial established that the Mladens' Purported Loans were made through entities wholly-owned by the Mladens, and not by the Mladens personally.  This evidence is sufficient to negate an essential representation upon which the Mladens' claim against the Debtor relies — that the Mladens personally loaned $925,784.00 to the Debtor.  *See, In re Reilly*, 245 B.R. at 773.  Additionally, HHLLC

objected to the allowance of the scheduled claim of the Mladens Purported Loans on the grounds that any funds advanced to the Debtor by the Mladens were in fact equity contributions, and not true debt.  In conjunction with the testimony of the Mladens, the documentary evidence supporting the Purported Loans cast serious doubts on whether the money advanced by the Mladens should be recharacterized as equity contributions: "The 'paradigmatic' recharacterization case involves a situation where 'the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.'" *In re BH S & B*, 420 B.R. at 157 (quoting *In re Adelphia*, 365 B.R. at 74).  The evidence in favor of recharacterization, taken as true, was also sufficient to negate the essential representation that the money the Mladens advanced to the Debtor was intended as a *bona fide* debt, not an equity contribution.

Accordingly, the Mladens bore the burden of proving, by a preponderance of the evidence, that the Purported Loans were, in fact, *bona fide* loans and not equity contributions to the Debtor.  Implicit in the Mladens' effort to establish the Purported Loans as *bona fide* loans is the proposition that monies from Eternity Fortune, Inc. and Goran's Investors, Inc. were in fact monies from Dusan Mladen and Vera Mladen to comport with the Debtor's Schedules.

ii.   **Application of the *AutoStyle* Recharacterization Analysis**

The *AutoStyle* Factors are meant to be a guide, not a score card; no one factor is necessary or dispositive and the weight of each factor is a function of the circumstances

in which the transaction occurred.  *See, In re AutoStyle*, 269 F.3d at 749-50.  As the Third

Circuit Court of Appeals noted in *In re SubMicron*:

> While these tests undoubtedly include pertinent factors, they devolve to an
> overarching inquiry: the characterization as debt or equity is a court's
> attempt to discern whether the parties called an instrument one thing when
> in fact they intended it as something else. That intent may be inferred from
> what the parties say in their contracts, from what they do through their
> actions, and from the economic reality of the surrounding circumstances.

*SubMicron,* 432 F.3d at 455–56.  The court's application of the *AutoStyle* Factors to the

facts of the present case follows.

1. *The Names Give to the Instruments, if any, Evidencing the Indebtedness.*  "When an

    advance occurs without any instruments of indebtedness, such an action points to an

    equity contribution."  *In re Lyondell*, 544 B.R. at 94 (citing *In re Broadstripe, LLC*, 444

    B.R. 51, 95 (Bankr. D. Del. 2010)).  Although Vera Mladen testified to having always

    written "loan" on checks made to the Debtor, *see* AP-ECF No. 70 at 28:28-28:49, the

    documentary evidence does not support her assertion.  *See* Def.'s Ex. 2.  Only the

    check from Goran's Investors, Inc. for $180,000.00 provides any indication that the

    money advanced to the Debtor by the Mladens through various corporate entities was

    contemporaneously identified as a loan.  *See* Def.'s Ex. 2A.  Both the Mladens testified

    that the Debtor had no formal documentation evidencing the Purported Loans beyond

    the documentary evidence produced at trial.  *See Testimony of Vera Mladen*, AP-ECF

    No. 71 at 23:31-25:03; *Testimony of Dusan Mladen*, AP-ECF No. 71 at 46:56-50:23.

    Not only did the Mladens fail to formalize any loan agreements with the Debtor, they

    failed to provide evidence that they, acting on behalf of the Debtor, formally accounted

    for the Purported Loans in the Debtor's records.  Accordingly, this factor weighs in

    favor of recharacterization.

2. *The Presence or Absence of a Fixed Maturity Date and Schedule of Payments*. "The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans." *In re AutoStyle,* 269 F.3d at 750. Here, both the Mladens testified that the Purported Loans were advanced without explicit terms, such as a fixed maturity date. *See Testimony of Vera Mladen*, AP-ECF No. 71 at 23:31-25:03; *Testimony of Dusan Mladen*, AP-ECF No. 71 at 46:56-50:23. Accordingly, this factor weighs in favor of recharacterization.

3. *The Presence or Absence of a Fixed Rate of Interest and Interest Payments*. "The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans." *In re AutoStyle,* 269 F.3d at 750. In the present case, Dusan Mladen testified that that Purported Loans were advanced without an interest rate and with no expectation that the Debtor would pay any interest. *See Testimony of Dusan Mladen*, AP-ECF No. 71 at 46:56-50:23. Accordingly, this factor weighs heavily in favor of recharacterization.

4. *The Source of Repayments.* "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *In re AutoStyle*, 269 F.3d at 751. Here, the Mladens expected to be repaid upon the sale of any of the Debtor's properties when the real estate market improved. *See Testimony of Dusan Mladen*, AP-ECF No. 71 at 46:56-50:23; AP-ECF No. 76 at 2:58-5:58. The Mladens expected to manage the Debtor and its properties for seven to ten years prior to an anticipated sale. *Id.* Moreover, Dusan Mladen specifically testified that a profitable sale was the only situation in which the Purported Loans would be repaid:

**Q:** When was it your intention that you would be paid back on these loans?

**A:** My intention was … at the time I was giving the money, I was convinced that either or we were going to sell the properties one by one, and then based on sales we would be able to take our part of the money that was lent to [the Debtor].  That was the only time that I was actually thinking that I would be paid back.

*Testimony of Dusan Mladen*, AP-ECF No. 76 at 23:39-24:33.   Since the source of repayment was the anticipated proceeds from a sale of some or all of the Debtor's properties, the Mladens' expectation of repayment depended solely on the Debtor's successful operation of its business to increase the value of its properties. Accordingly, this factor weighs heavily in favor of recharacterization.

5. *The Adequacy or Inadequacy of Capitalization.*  Thin or inadequate capitalization, at the time of the transaction, is strong evidence that the money advanced was intended as a capital contribution rather than a loan.  *In re AutoStyle,* 269 F.3d at 751.  Although some courts have cautioned against over-emphasizing this factor "because all companies in bankruptcy are in some sense undercapitalized," the Purported Loans at issue here were advanced years before the Debtor filed for chapter 11 protection. *See, In re BH S & B*, 420 B.R. at 159.  Dusan Mladen testified that the Purported Loans were advanced so that the Debtor could make capital improvements – such as kitchen and bath apartment renovations, as well as roof and elevator repairs – to newly acquired real estate properties.  *See Testimony of Dusan Mladen*, AP-ECF No. 71 at 46:56-50:23; AP-ECF No. 76 at 2:58-5:58.  Dusan Mladen further testified that the Debtor did not have sufficient cash reserves to pay for these necessary such capital improvements.  AP-ECF No. 76 at 2:58-5:58.  Based on this testimony, the court infers that the Debtor was insufficiently capitalized at the time of the Purported Loans; accordingly, this factor weighs slightly in favor of recharacterization.

6. *The Identity of Interest between the Creditor and the Stockholder.* "If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt." *In re AutoStyle*, 269 F.3d at 751. This factor applies most clearly "when several stockholders extend the funds, and one can measure the proportion of the contribution of each against the stock ownership of each." *In re Lyondell*, 544 B.R. at 98. This factor is largely inapplicable in the present case because the Purported Loans were treated by the Mladens, the Debtor, Goran's Investors, Inc., and Eternity Fortune, Inc. as having been advanced by the Mladens without regard to any corporate formalities. *See Testimony of Dusan Mladen*, AP-ECF No. 76 at 38:34-39:24; *see also,* AP-ECF No. 76 at 6:00-23:40. Accordingly, this factor is not relevant.

7. *The Security, if any, for the Advances.*

> [W]hen loans are made on an unsecured basis, they are much easier to recharacterize than secured loans, and deserve higher scrutiny; the additional formality associated with secured loans, and the need to perfect their security interests, tends to make secured loans particularly difficult to recharacterize. But bona fide loans have been made on an unsecured basis for decades, if not centuries (e.g., when insurance companies made private placement loans on an unsecured basis), and the fact that they were made without security cannot be regarded as a "strong indication" that loans documented as such were really "capital contributions rather than loans."

*In re Lyondell*, 544 B.R. at 98. In the present case, it is undisputed that the Purported Loans were advanced on an unsecured basis. Accordingly, this factor weighs slightly in favor of recharacterization.

8. *The Corporation's Ability to Obtain Financing from Outside Lending Institutions.* At trial neither the Plaintiff nor the Mladens presented any evidence of the Debtor's ability

to obtain financing from outside lending institutions.    Accordingly, this factor is inapplicable.

9. *The Extent to which the Advances Were Subordinated to Claims of Outside Creditors.* "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."  *In re AutoStyle,* 269 F.3d at 752.  Although the Purported Loans were not formally subordinated to the claims of other creditors, Dusan Mladen testified that the Debtor had made no payments on any of the Purported Loans, nor was any repayment expected prior to the sale of some or all of the Debtor's properties.  *See Testimony of Dusan Mladen*, AP-ECF No. 71 at 46:56-50:23; AP-ECF No. 76 at 2:58-5:58; AP-ECF No. 76 at 6:00-23:40.   From this testimony, the court infers that the Purported Loans were meant to be subordinate to the claims of other creditors.   Accordingly, this factor weighs heavily in favor of recharacterization.

10. *The Extent to which Advances Were Used to Acquire Capital Assets.*   "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."  *In re AutoStyle,* 269 F.3d at 750.  The evidence at trial was inconclusive on this issue.  Although Dusan Mladen testified that the proceeds of the Purported Loans were used to make capital improvements to the Debtor's properties, *see* AP-ECF No. 76 at 2:58-5:58, both he and Vera Mladen also testified to using the advances to pay normal operating expenses such as regular mortgage payments.   Accordingly, this factor does not weigh in favor of or against recharacterization.

11. *The Presence or Absence of a Sinking Fund.*[9]  "The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans."  *In re AutoStyle*, 269 F.3d at 753.  Here, Vera Mladen testified that the Debtor had not established a sinking fund for the repayment of the Purported Loans. However, as noted by the court in *In re Lyondell*, the relevance of this factor is questionable at best:

> Of course the presence of a sinking fund would strongly support a finding of debt. But the converse is not necessarily true. Each court appears to have assumed that sinking funds would be the norm in bona fide loans—but that assumption is at best debatable. To the contrary, the Court wonders, based on its experience, whether sinking funds in modem corporate financings are in any way the norm (or in this day even common), and this Court would need evidence proving up the assumption as to this point before it would ever draw an inference that the absence of a sinking fund on corporate debt is in any way meaningful.

*In re Lyondell*, 544 B.R. at 101.  This court declines to infer that the Purported Loans were intended as an equity contribution based on the Debtor's failure to establish a sinking fund.  Accordingly, this factor is not relevant.

## V.   <u>Conclusion</u>

Based on the trial record, it appears to the court that seven of the eleven *AutoStyle* factors weigh in favor of recharacterization.  Most significantly, the lack of any formal written agreements memorializing the terms and conditions upon which the Purported Loans were to be repaid, the absence of a fixed maturity date, payment schedule, interest rate, the expectation of repayment only upon a successful sale of the Debtor's properties,

---

[9] [S]inking fund (18c) A fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt. — Abbr. SF.
FUND, Black's Law Dictionary (10th ed. 2014)

and the complete subordination of the Mladens' right to repayment to those of all other creditors evince an intent by the Mladens to provide liquidity to their family business while avoiding the formal and financial obligations associated with arms-length financing.

Taken together, the facts and circumstance of this case all but compel the court to the conclusion that the Purported Loans transactions have the substance and character of equity contributions.  To hold otherwise would disregard the substance of the Mladens' clear intention that they would be repaid only if the Debtor's property were sold or when the Debtor could operate at a profit, and instead would allow insiders to thwart the distributional schemes of the Bankruptcy Code to the detriment of creditors holding *bona fide* claims against the Debtor.

## VI.    <u>Order</u>

After considering the parties' pleadings, memoranda, the relevant documents filed on the docket in this adversary proceeding and the Debtor's Main Case, the arguments and testimony offered during the trial, and for the reasons stated above, it is hereby

ORDERED, that HHLLC's objection to the scheduled $925,784.00 in Purported Loans advanced by the Mladens is SUSTAINED; and it is further

ORDERED, the Mladens' scheduled claim of $925,784.00 is disallowed as an unsecured claim, and recharacterized as an equity contribution; and it is further

ORDERED, that judgment on Count One of the Complaint shall enter in favor of the plaintiff; and it is futher

ORDERED, that judgment on Count Two of the Complaint shall enter in favor of the plaintiff; and it is further

ORDERED, that judgment on Count Three of the Complaint shall not enter in favor of the plaintiff because the relief sought is MOOT; and it is further

ORDERED, that the Debtor shall file amended schedules reflecting the effect of this Order by no later than September 30, 2016.

Dated on September 16, 2016, at New Haven, Connecticut.

Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut